UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LOUIS SOCK, III,

        Petitioner,

                                 CASE NO. 05-CV-70379-DT

v.                             JUDGE GERALD E. ROSEN

                                MAGISTRATE JUDGE PAUL J. KOMIVES

JAN TROMBLEY,

        Respondent.

_____/

## <u>REPORT AND RECOMMENDATION</u>

*Table of Contents*

I.    <u>RECOMMENDATION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
II.   <u>REPORT</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . 5
    C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    D.   *Ineffective Assistance of Counsel and Denial of a Continuance (Claim I)* . . . . . 18
        1.   *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        2.   *Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            A.   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            B    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        3.   *Denial of a Continuance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
            A.   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
            B.   *Analysis*   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    E.   *Brady Violation and Improper Opinion of Guilt Testimony (Claim II).* . . . . . . . 33
        1.   *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        2.   *The Brady Violation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            A.   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            B.   *Analysis*   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        3.   *The Opinion Testimony of Lt. Petersen* . . . . . . . . . . . . . . . . . . . . . . . . 41
            A.   *Applicable Law*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
            B.   *Analysis*   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    F. *Restrictions on Cross-Examination (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . 43
        1.   *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        2.   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        3.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

     G.     *Evidentiary Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

     H.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . 49

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Louis Sock III is a state prisoner currently confined at the Saginaw Correctional Facility in Freeland, Michigan.

        2.      On July 12, 2001, petitioner was convicted of one count of second degree murder, MICH. COMP. LAWS § 750.317; and one count of mutilation of a dead body, MICH. COMP. LAWS § 750.160, following a jury trial in the Wayne County Circuit Court. Petitioner was acquitted of first degree premeditated murder. MICH. COMP. LAWS § 750.316. On August 3, 2001, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to concurrent terms of 50 to 75 years' imprisonment.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, AND A FAIR TRIAL, BECAUSE THE JUDGE REFUSED TO GRANT ADDITIONAL TIME FOR TRIAL PREPARATION, OR BECAUSE TRIAL COUNSEL DID NOT PROPERLY PREPARE IN THE TIME ALLOTTED.

        II.     THE PROSECUTOR ERRED BY FAILING TO DISCLOSE EVIDENCE POSSESSED BY THE POLICE, AND THEN COMMITTED REVERSIBLE ERROR BY INTRODUCING, OVER OBJECTION, THE CASE INVESTIGATOR'S CONCLUSION AS TO DEFENDANT'S GUILT.

        III.    THE TRIAL JUDGE DENIED DEFENDANT'S RIGHTS TO CONFRONTATION AND A FAIR TRIAL BY PROHIBITING CROSS-EXAMINATION THAT WOULD HAVE REBUTTED A PROSECUTION CLAIM, AND COULD HAVE IMPEACHED WITNESS TESTIMONY AND SUPPORTED THE DEFENSE.

The court of appeals found no merit to petitioner's claims and affirmed his convictions and sentences. *People v. Sock*, No. 238455, 2003 WL 22160710 (Mich. Ct. App. Sept. 18, 2003) (per curiam) ("State Appeal").

    4.    Petitioner, through counsel, sought leave to appeal these three issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Sock*, 470 Mich. 857, 679 N.W.2d 75 (2004).

    5.    Petitioner, though counsel, filed the instant application for a writ of habeas corpus on February 2, 2005.  As grounds for the writ of habeas corpus, he raises the three claims that he raised on direct review in the state courts, now stated as:

> I.    DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL (US CONST. AMENDS. VI, XIV), AND A FAIR TRIAL, BECAUSE TRIAL COUNSEL WAS NOT PREPARED FOR TRIAL, AND TOLD THE JUDGE SO, AND BY THE JUDGE'S REFUSAL TO GRANT ADDITIONAL TIME TO PREPARE.

> II.    PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL (US CONST. AMENDS. V, XIV) WAS VIOLATED WHERE THE PROSECUTOR FAILED TO DISCLOSE REQUESTED EVIDENCE POSSESSED BY THE POLICE PRIOR TO TRIAL, AND INTRODUCED THE CHIEF INVESTIGATOR'S CONCLUSION AS TO PETITIONER'S GUILT AT TRIAL..

> III.    THE TRIAL JUDGE DENIED DEFENDANT'S RIGHTS TO CONFRONTATION AND A FAIR TRIAL (US CONST. AMENDS. V, VI, XIV) BY PROHIBITING CROSS-EXAMINATION WHICH WOULD HAVE CONTRADICTED OR REBUTTED A CLAIM AND TESTIMONY ADVANCED BY THE PROSECUTION, AND SUPPORTED THE DEFENSE.

    6.    Respondent filed his answer on August 10, 2005.  He contends that petitioner's claims are without merit.

    7.    Petitioner filed a reply to respondent's answer on September 22, 2005.

B.    *Factual Background Underlying Petitioner's Conviction*

On March 19, 1998, 32 year old Tracy Minnella disappeared.  A year later police discovered bone fragments and teeth subsequently identified as her remains in the garage and backyard of 20522 Hamburg in Detroit, a rental property owned by petitioner.   In November of 2000 petitioner was arrested and charged with first degree premeditated murder and mutilation of a dead body.

It was the prosecution's theory that petitioner beat Minnella to death on the day she disappeared and/or possibly shot her, hid her body, burned her remains in the backyard of the Hamburg house in the following fall or early winter, and swept the charred debris into two metal trash cans which he left on the premises.  It was the prosecution's further theory that, sometime between police searches on May 9 and May 17, 1999,  petitioner's son "Sonny," acting on orders from his father, removed and disposed of the metal cans and in the process dumped  the contents (including bones and teeth) onto the Hamburg backyard.  The evidence  at trial roughly fell into the indicated categories.

*Petitioner's Relationship to the Deceased*

It was established at trial that Minnella and petitioner had a long-term relationship and had lived together at petitioner's house on Moon Street in Detroit for several years until March of 1997. They  were reportedly both drug and alcohol abusers and he had subjected her to physical abuse. One witness described an incident in a bar in the fall of 1996 where petitioner dragged Minnella by the ankle and wrist across the floor and kicked her in the ribs.  Family members testified that in March of 1997 Minnella moved back home after an incident where petitioner had physically abused her, threatened to kill her, chopped off her hair and urinated on her.   It was established through the testimony of petitioner's family and friends that Minnella nonetheless continued to see petitioner.

5

The evidence showed too that petitioner continued to threaten Minnella after she moved out. The victim's father, Vincent Minnella, described an occasion about three months before the disappearance where petitioner called and asked for Minnella. When Vincent told him that she was not there petitioner in a threatening manner said she owed him money and that she had three months to take care of it. The victim's sister Jennifer Minnella testified that when petitioner would call the house and she would refuse to put Minnella on the line he would call Jennifer names and threaten to kill Minnella.

. At the time of her disappearance, Minnella was working at a real estate/construction company operated by Richard Schofield, whom she was dating. Schofield reported that petitioner would call Minnella at work frequently, upsetting her. A week or two prior to her disappearance Schofield found her in the office crying while on the phone. He could hear a loud voice coming through the receiver. Schofield told her to hang up. The phone rang again and Schofield answered it. Petitioner asked for Minnella and Schofield told him that she could not take personal calls at work anymore. Petitioner told him to put that bitch back on the phone and threatened Schofield to watch his back and that he might find someone on his porch one night. Petitioner called Schofield back within about a week and wanted to meet to discuss Schofield's and Minnella's relationship. Schofield declined. Schofield denied that petitioner wanted to talk about injuries which Minnella sustained while she was on vacation with Schofield in February. Schofield explained that Minnella had gotten black eyes and a bruised nose when she dove into the ocean and hit bottom.

Telephone records from the end of January of 1998 until the day before her disappearance showed calls from petitioner's residence on Moon to Minnella's home or work place virtually every day and repeated calls on some days. There were no calls on the day she disappeared.

6

*The Events Surrounding the Disappearance*

On Thursday, March 19, 1998, Minnella and her sister Jennifer concocted an excuse so that Tracy could leave work early.  Jennifer called Schofield sometime before 11:00 a.m.  and explained that Minnella need to leave.  Minnella left  at 11:00 a.m., promising to return.   Telephone records showed calls from the Minnella residence to Jennifer's workplace at 11:31 a.m. and to petitioner's Moon Street residence at 11:47 a.m.

In support of its theory that Minnella then went to petitioner's residence, the prosecution presented the  testimony of petitioner's son John and petitioner's friend Michael Stuhldreer.

John Sock was fourteen at the time of trial and ten at the time of Minnella's disappearance. In March of 1998, he went to the circus with his father and afterwards stayed with him at the Moon residence.  Minnella came to the house one day that week in the early afternoon.  John let her in and she went upstairs to petitioner's bedroom.  A little while later John heard loud talking and arguing followed by loud pounding.  He had never heard sounds like that from Minnella and his father before and he was scared.   This went on for about twenty minutes and then Stuhldreer arrived. Stuhldreer told him that his dad wanted John to go with Stuhldreer to a bar.  John had called his mother earlier that day and was waiting for her to pick him up and so informed Stuhldreer.

Stuhldreer called out to petitioner that he was there and petitioner came downstairs.  John observed that there was something wrong with his hand, that he had a towel or a T-shirt around it. After that, John and Stuhldreer waited outside in Stuhldreer's truck until the boyfriend of John's mother arrived and took John with him.

When cross-examined about the date that this occurred, John replied that he was sure he called his mother that day and that it was either a Friday or Saturday.  John also acknowledged that

7

he did not tell anyone about this event until February of 2001.  He was seeing a therapist and he would remember more things as time went on.

John further stated that he did not return to his father's house for a couple of weeks or a couple of months because he was nervous about going back.   When he did go back, he observed what he described as a frisbee-sized bloodstain on the upstairs carpeting in the loft-office space outside of petitioner's bedroom.   Sometime after that the carpeting was changed.   He did not tell anyone about seeing this stain until June of 2001.

Telephone records showed that there were calls from the Moon residence to John's mother's home each day from Saturday, March 14, 1998  through Wednesday, March 18, 1998 but none on March 19, 1998.

Michael Stuhldreer testified that on March 19, 1998 petitioner paged him to come and pick up John.  When he arrived he observed Minnella's car in front of the house.   Inside, he heard screams and other sounds and recognized both petitioner's and Minnella's voices.  Stuhldreer  did not know if they were arguing or having sex.  Petitioner came downstairs in his underwear, sweating and breathing hard, and told Stuhldreer to go ahead and take off.   He otherwise looked normal and there was nothing wrapped around either hand.  Stuhldreer took John outside to wait for John's ride.

Stuhldreer  also testified that he was part of a large group that  had accompanied petitioner to the circus and that petitioner had been angry because Minnella was supposed to go with them and had  never showed up.  This had been three or four days before the day he went to the Moon house and picked up John.[1]  Sometime after Minnella's disappearance petitioner told Stuhldreer  that he

---

[1] It was stipulated that the Shrine Circus was in Detroit from March 6 to March 22, 1998.

thought Minnella had gone to Florida or into a missing witness program.

John Bates, a Clinton Township police officer, testified that petitioner came to the station for questioning on April 10, 1998.  Petitioner said that he had last seen Minnella on March 17, 1998 when they went to the circus.  He denied that he had ever assaulted her.

### Petitioner's Post-Disappearance Conduct at the Moon Residence

The prosecution presented two witnesses who testified to petitioner's seemingly suspicious redecorating after the disappearance.  Roger Merritt and Jerry Brunner testified that on March 16, 1998 they installed new carpeting at the Moon house in the bedrooms in the basement and on the first floor and in the upstairs bedroom and the area outside the bedroom.  Petitioner declined to have the stairs to the upper level done because they needed repairs.  Less then a month later, petitioner called and said he wanted the upstairs redone because the carpet was too light.  When Merritt explained that he only had white carpet in stock, petitioner responded that white would be fine. When they arrived to install it on April 17, 1998  petitioner had removed all the carpet, pads, and tacks in the upstairs.  Merritt described this as not being "normal procedure."  (7/3/01 Trial Transcript p. 17).  Petitioner also had them carpet the stairs even though they had not been repaired.

In addition, Dutch Henderson testified that petitioner had him come to the Moon house in 1998 to do an appraisal but that petitioner would not let him go upstairs.  Some carpeting was being done this day.   The next time Henderson went to the house petitioner was putting it up for sale and he was cleaning the doorjambs with industrial cleaner.

### The Burning at the Hamburg House

In support of its theory that petitioner burned the deceased's body, the prosecution presented several witnesses who described seeing petitioner burning debris in the backyard of the Hamburg

house in the late fall or early winter after Minnella's disappearance.

Shunda Fenderson testified that she and various members of her family moved into the Hamburg house in July of 1998. She found the house through Eric Taylor[2] but later learned it was actually petitioner who owned it. There was no access to the garage because a red Camaro or Firebird was parked against the front garage door and the side door was padlocked. Taylor hired Warren Ivery[3] to do some repairs on the house. The following December or January, petitioner called and asked if she wanted him to come over and clean out the garage. She told him to come over while she was at work. Some day after that she came home from work and found the garage door open and the red car across the street. She closed the doors and secured them with a brick. Ivery was not there that evening. When she came home from work the next day the doors were open again and she noticed a burned area on the ground next to the side door of the garage covered with a piece of plywood. She never noticed a bad smell on the premises.

Ivery testified that he worked for Eric Taylor at the Hamburg house. One day in the fall of 1998 or early winter of 1999 petitioner was there. The garage door was open and petitioner, whom he had never met before, had a terrible smell on him, "like something was dead or been dead for awhile..." (7/2/01 Trial Transcript p. 122). He sent Ivery to buy gasoline and gave him a five gallon can. Ivery returned with $4.00 worth of gas. He continued working inside the house and later noticed a fire burning near the side of the garage. Ivery went outside after petitioner left just before dark. The garage door was closed and the car backed up to the door again. He observed a bone in the fire. It was about 16" to 18" long with knots on the end which he thought to be a human leg

---

[2] Petitioner's older son identified Taylor as being a friend of his father.

[3] Spelled "Ivory" in some of the transcripts.

bone.   He asked a heavyset elderly woman who resided in the house if she wanted to come out and see it but she declined.   He told Eric Taylor and "the world" about it (7/2/01 Trial Transcript p. 121) but only told the police after there had been television publicity and after the police came to him.

Thomas Nowicki lived next door to the Hamburg house.   He came home one day in November of 1998 and saw that a fire was burning on the lawn next to the Hamburg garage.   The fire was in a metal garbage can and he saw the flames shoot up about twenty feet.   Petitioner was standing by the fire and petitioner's son Sonny was near the house.   Petitioner said he was cleaning out the garage and there were dead muskrats in there.   Nowicki knew there was a muskrat or possum problem in the area.   He did not notice any unusual odors.   There were usually three metal cans in the yard and he thought that they swept up the debris and put it into the cans.   In his statement to the police in March of 1999,  Nowicki provided that he saw them rake up the mess from the ground and put it into the two metal cans.   During the months from March until November, the Hamburg garage doors were at times open and he observed that a blue GM car "like a Nova" was parked inside.(7/2/01 Trial Transcript p. 161).  It was not a Chevy Beretta.[4]

Petitioner's son Louis Sock IV, known as Sonny,  testified that he and Martha Staley drove over to the Hamburg house to pick up petitioner sometime in November or December of 1998 or early 1999.   It was almost dark and petitioner was standing by a fire on the ground next to the garage, apparently putting it out.   The next door neighbor came by and petitioner said he was burning some dead possums from the backyard.   There was a horrible smell in the yard and on petitioner.   The garage doors were shut and the Camaro parked in front of them.   Petitioner also kept

---

[4]  The deceased's Chevy Beretta was never found.

11

a gray Cadillac on the lawn.[5]  Martha Staley similarly testified to the fire and the foul smell and the Camaro being parked in front of the garage.

Michael Stuhldreer  testified that sometime after the disappearance, he thought just before Thanksgiving,  he went to the Hamburg house to meet petitioner and saw petitioner burning leaves in a trash can.   The fire stank and petitioner said he had thrown a possum into it.

### The Searches at Hamburg and the Intervening Circumstances

On March 3, 1999, Clinton Township Detectives Melise and Hall went to the Hamburg location and obtained a consent from one of the residents "to do a cursory inspection in the back."(7/5/01 Trial Transcript p. 37).   The backyard was covered with snow and they observed a burn pit.  Two tin garbage cans containing ice, water and burnt debris were in back of the garage. There was a cinder block in the pit with some burnt material on it that Melise thought appeared to be blue jean material although he was not sure.   Nearby was a burnt two by four with some hair on it; subsequent laboratory analysis determined that the hair was animal in origin and that the wood did not contain any body fluids or tissue.  The cinder block and the metal cans were left there.

After the police came this first time Shunda Fenderson (the tenant) called Eric Taylor and told him of the interest in the backyard and asked him if there was a problem.

Sonny Sock testified that sometime after February of 1999, while visiting his father at Macomb Correctional Facility, petitioner asked him to remove the metal trash cans from the backyard at the Hamburg house.  When he next visited petitioner at the Macomb facility petitioner

---

[5] Lieutenant Petersen testified that the Camaro was located and searched in August of 1999 and  nothing of evidentiary value was found.  A 1986 Cadillac believed to be in petitioner's possession in March of 1998 was also located and searched with the same result.  The Cadillac believed to be the one described above was never located.

asked if he had taken care of this. Sonny admitted that he had not and petitioner told him to make

sure that he did because petitioner had used the cans to burn some valium.   The request seemed

"somewhat" urgent. (7/2/01 Trial Transcript p. 66).  Sonny found the two metal garbage cans at the

side of the garage.  They were uncovered, full of snow and ice and appeared to be burnt at the top.

Sonny dumped them out in the backyard and then took the barrels and disposed of them elsewhere.

On March 17, 1999 Clinton Township detectives and Detroit investigators returned to the

Hamburg location with a search warrant and discovered that the metal trash cans were missing.   A

human vertebrae was observed in the snow in the backyard.  A white mineral powder covered the

whole garage floor and the lower parts of the walls, and two bone fragments were found in the rear

of the garage.  A few other fragments were observed  protruding from the snow on the ground at the

side  of the garage.  Space heaters were used to melt the snow and more bone fragments and three

teeth were found in a ten by fifteen foot area  around the burnt ground, an area which smelled of

gasoline.  Melted plastic covered some rocks and bricks in that area.   Although the technicians

excavated layer by layer nearly everything was found at the surface.

*The Bloodstain Found at the Moon Residence*

On August 12, 1999, Detroit police executed a search warrant at petitioner's Moon residence,

removed carpeting from the upstairs bedroom area and processed and cut out sections of the floor

containing five suspected blood spots.  Blood samples were taken from the parents of the deceased

and from petitioner.  Dr. Susan Greenspoon, a forensic serologist, conducted DNA testing and

concluded that one bloodstain contained a mixture consistent with the DNA profiles of a  biological

child of Minnella's parents and of petitioner.  Statistically, Greenspoon explained that it is 200,000

times more likely that it was a biological child of Minnella's parents that contributed to this stain

13

than a random member of the Caucasion population.   It could not be determined whether the blood was Minnella's or petitioner's or  whether it was menstrual blood, and the DNA profiles could have been from semen or saliva or other bodily fluids.  The age of the sample was not determined.

*The Opinions of the Prosecution's Experts Based on Examination of  the Remains*

The bone fragments were of the skull, jaw, teeth, vertebrae, ribs, fingers, ankle, arm, and thigh (femur).   The latter was described as a long bone with two knobs and the fragment was approximately six inches long.  .

Dr. Frank Saul, a biologic anthropologist, compared the remains with a 1979 x-ray of Minnella's spinal column and positively identified the fragments of  three vertebrae as  being the victim's.  He also observed that the x-ray showed a fracture in rib number seven that was consistent with a fracture callous on the fragment of rib number seven among the remains.

Julie Saul, a forensic anthropologist, examined the remains and testified to her conclusions: The bones were all from one person and ranged from burned black to not burned at all.  The burning did not take place immediately after death or while the body was intact or fully fleshed .  Some of the fractures on the bones occurred postmortem, during and after burning, and some were "perimortem," that is, around the time of death.   The pattern of the fractures in the skull fragments indicated perimortem and pre-burning blunt force trauma.   Putting fragments of the facial bones together revealed a hole that could possibly have been caused  by a bullet entering after fracturing by blunt force injury.   Only the fracture on a rib fragment showed signs of healing.  There were no signs of the bones having been cut or sawed.

Gary Berman, a forensic dentist, compared the three teeth found at Hamburg with Minnella's dental x-rays from November of 1994 and made a positive identification.

*The Defense Case*

The defense presented four witnesses.  Tyrone Taylor testified that he met petitioner at the Hamburg residence a day or so after April 18, 1998 because he wanted to buy a used car for his daughter.  The garage was open and there were three cars in the backyard, a Camaro, an approximately 1986 Cadillac, and a Chrysler.  Petitioner offered to sell the latter two and Taylor thoroughly inspected them inside and out.   He saw nothing unusual and bought the Chrysler.

Petitioner's sister, Deborah Sock,  and his mother, Agnes Sock,  each testified and identified photographs of Minnella taken at a baby shower on April 20, 1997 showing that she had extremely long hair.[6]  Both also testified to visiting the Moon residence at the end of March, 1998 and going through the entire house to inspect the improvements.  They knew petitioner had been working on the house for some time and neither saw anything unusual.

Dr. Werner Spitz, a forensic pathologist, gave the following opinions: The semi-circular hole in the skull was not caused by a bullet.  All of the fractures on the remains were post-mortem since there were no signs of healing.  He found the term "perimortem" to be "baffling." "(7/11/01 Trial Transcript p. 16).   He agreed that there was no evidence of hacking and sawing.  Likewise there was no evidence of chemical damage to the remains, such as would result from lime.  It would not have been difficult to determine if the white powder from the garage was in fact lime.  A decomposing body would emit a strong odor and bodily fluids.  A body could not have been reduced to these few  remains as a result of the fire described by the prosecution witnesses.   The remains

---

[6]  This testimony was introduced to rebut the testimony of Minnella's father and sister about the incident of abuse where petitioner allegedly chopped of Minnella's hair.  The prosecutor called Robin Minnella in rebuttal and she identified a photograph of Minnella with short hair taken on May 3, 1997.

were devoid of most tissue due to decomposition and not fire.   A toxicology examination should have been performed because drugs or poisoning are always a consideration when there is not a full body.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

16

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Ineffective Assistance of Counsel and Denial of a Continuance (Claim I)*

Petitioner claims that he was denied the effective assistance of counsel and a fair trial because his attorney did not adequately investigate and was not  prepared for trial and the trial court denied counsel additional time to prepare.

*1. Background*

The preliminary examination was held on three days between January 4 through January 11, 2001.  Trial counsel subsequently obtained several discovery orders, and requested new discovery orders and/or compliance several times on the record.   The discovery process was complicated by the involvement of several police agencies, specifically the Clinton Township and Detroit police departments and the FBI.  The Clinton Township discovery materials were not turned over to the defense until May 31, 2001.  On that date, trial counsel moved on the record for an adjournment, explaining that he could not be ready for trial in three weeks.  He described the Clinton Township

18

discovery materials as being more than two inches thick and involving material which he had not

seen before.  The trial court denied the motion.   Between this time and the date set for trial, there

were several new developments in the case, including a change in the prosecution's forensic dentist,

the prosecution's filing a similar acts motion, the defense filing motions for additional discovery and

exhumation of the remains, etc.   On June 26, 2001, the date set for trial, defense counsel made

another motion to adjourn stating that he was not prepared to proceed.  The trial judge referred the

motion to the presiding judge.  The presiding judge denied the motion and ordered counsel to

proceed to trial.  When counsel refused, he was jailed for the remainder of the day.  Petitioner asserts

in his petition that it appeared that an agreement was reached that trial counsel would be released

at the end of the day, that he would proceed with jury selection and various motions on the following

two days (Wednesday, June 27, 2001 and Thursday June 28, 2001) and that the prosecution's proofs

would not begin until the following Monday.  This is in fact how the parties proceeded.

Petitioner timely and properly moved the Michigan Court of Appeals  for a remand to the

trial court so that he could make an evidentiary record in support of this and another issue (Claim

II) and attached several documents and affidavits in support of the motion.  The Court of Appeals

denied the motion to remand "for failure to persuade the Court of the need for a remand at this time."

*People v. Sock*, No. 238455 (Mich. Ct. App.,  December 16, 2002).

In its opinion affirming petitioner's convictions,  the Michigan Court of Appeals held that

the alleged prejudice was too speculative to merit relief, even considering the exhibits submitted in

support of the motion for remand:

> Defendant first alleges ineffective assistance of counsel, either because the lower
> court abused its discretion in failing to grant defense counsel enough time to prepare,
> or because defense counsel did not allot himself sufficient time to prepare.  Because
> there has been no evidentiary hearing in the trial court regarding ineffective

19

assistance of counsel, our review is limited to what is apparent from the record. *People v. Rodriguez*, 251 Mich.App 10, 38; 650 NW2d 96 (2002). Our Supreme Court recently made it clear that "a trial court's decision whether to grant a continuance is reviewed for an abuse of discretion" under the *Spalding* standard. *People v. Jackson*, 467 Mich. 272, 276-277; 650 NW2d 665 (2002), citing *Spalding v. Spalding*, 355 Mich. 382, 384; 94 NW2d 810 (1959), under which abuse of discretion involves a result "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *Spalding, supra* at 384-385. Ineffective assistance of counsel requires defendant to "overcome a strong presumption that counsel's performance constituted sound trial strategy" and requires the defendant to show prejudice. *People v. Carbin*, 463 Mich. 590, 600; 623 NW2d 884 (2001).

The lower court concluded that defense counsel was not lacking any discoverable materials or that defense counsel was unprepared for trial, despite defense counsel's protestations to the contrary. Defendant has not shown anything to indicate that the lower court abused its discretion when it declined to grant defense counsel any continuances. Defendant does provide a number of alleged errors made by defense counsel that defendant suggests would not have been made had defense counsel been prepared, but any prejudice defendant might have suffered as a result is speculative. Moreover, several errors are based on exhibits not properly before this Court because they were not filed with the lower court. Even considering those exhibits in light of defendant's request to remand for an evidentiary hearing, *People v. Ginther*, 390 Mich. 436, 443-444; 212 NW2d 922 (1973), any prejudice is still speculative. Therefore, defendant fails to show that the lower court abused its discretion, that defendant's trial counsel was ineffective on the record, or that defendant is entitled to a remand.

State Appeal, pp.1-2, 2003 WL 22160710*1.

Petitioner unsuccessfully renewed his request for a remand for an evidentiary hearing in a motion for rehearing in the Court of Appeals and in his application for leave to appeal to the Michigan Supreme Court.

In his habeas petition, petitioner has again moved for an evidentiary hearing, attaching the same exhibits in support as he did in the state courts. Respondent argues that the decision of the Michigan Court of Appeals was neither contrary to nor an unreasonable application of Supreme Court precedent.

20

### 2. *Ineffective assistance of counsel*

### A. *Applicable Law*

To establish a violation of the right to effective assistance of counsel, petitioner must satisfy two components. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To demonstrate that counsel's performance was deficient, petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Judicial review of counsel's performance must be highly deferential, with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Id.* at 689. The defendant must overcome the presumption that the challenged action or inaction "might be considered sound trial strategy." *Id.* (citation omitted). Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact entitled to de novo review. *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir.2000).

### B. *Analysis*

Even considering the exhibits he has submitted, Petitioner has failed to show that the Michigan Court of Appeals' decision was contrary to or an unreasonable application of the

21

applicable Supreme Court precedent.

Initially, Respondent's argument that trial counsel's performance during trial showed that he was adequately prepared is supported by the record. A review of the trial transcripts, particularly trial counsel's arguments and cross-examination, shows that he was very familiar with the evidence and the applicable law and that he vigorously defended his client. While defense counsel declined to cross-examine the prosecution's forensic dentist because he had not received the requested x-rays and records, petitioner does not allege that this constituted ineffective assistance and Dr. Saul independently identified the remains as being Minnella's. Trial counsel succeeded in having petitioner acquitted of the higher first-degree murder charge.

Petitioner argues that his trial attorney failed to present witnesses and other evidence that would have contradicted, undermined and rebutted the prosecutions basic theories of guilt, in what was a largely circumstantial case. However, a review of the exhibits shows that even if this evidence had been presented to the jury, there is not a  reasonable probability that the outcome of the proceeding would have been different. The proffered proofs fall into the indicated  categories.

1.) Evidence that the deceased was seen after Thursday, March 19, 1998, the day she disappeared and was allegedly killed by petitioner.

As petitioner points out, the prosecution's proofs showed that an apparently violent encounter between petitioner and the deceased occurred on the day Minnella disappeared and after which she was never seen again. There were two witnesses to this encounter. John Sock , who was a child at the time, was not able give a firm date. He  testified that he was sure he called his mother that morning, while the telephone records established that the last telephone call to his mother's house from petitioner's house that week was for March 18, 1998, the day before Minnella

22

disappeared.  The second witness to the encounter was Michael Stuldreer, an adult friend of petitioner, and the prosecutor established through him that the date was March 19, 1998.

Petitioner has submitted a police report from the Clinton Township police department which contains the names of seven witnesses including a narcotics officer who reported seeing Minnella after that date, and affidavits pertaining to three of these witnesses.  Petitioner correctly argues that trial counsel was aware of this information as he listed all seven witnesses on the defense witness list and unsuccessfully attempted at trial to elicit the reported sightings on cross-examination of a police witness (the trial court sustained the prosecution's hearsay objection).   None of the seven witnesses was called to testify at trial.  Petitioner claims that this constituted ineffective assistance as these witnesses would have contradicted the prosecution's theory that petitioner killed Minnella during the violent encounter overheard by John and Stuldreer.

What petitioner fails to point out is that none of the seven witnesses *knew* Minnella. According to the Clinton Township police report, these were simply  people who called in and reported sighting someone who fit Minnella's description or who looked like her photograph.  This is also clear from the affidavits petitioner has provided.   The first affidavit is from a private investigator who states that he interviewed the narcotics officer,  Lieutenant Picard, and Picard said that he saw a photograph of the deceased and was "fairly certain" that he saw her in April of 1998. Picard also said that he would not sign an affidavit to that effect.  The second affidavit is from the same investigator stating that he interviewed Katherine Ross and she told him that in April of 1998 she saw a televised report of Minnella's disappearance with her photograph and that she believed that she had seen this woman walking by her house in the rain earlier that day.  The investigator further states that he had since been unable to contact Ross.  The third affidavit is from a taxi driver

23

who states that in November of 1998 he saw a missing person flyer for Minnella and then saw  a woman who resembled her and who fit her description.

Had trial counsel presented these witnesses, the evidence would have only shown that a person or persons who looked like Minnella had been seen after the day of her disappearance.  This would hardly have undermined the testimony of the witnesses who knew her, including her family, who never saw her or heard from her again after March 19, 1998.

2.) Evidence that Warren Ivery lied when he testified that he told a resident at the Hamburg house that he saw a human bone in the fire.

Part of the prosecution's theory was that petitioner burned all or part of Minnella's body at the Hamburg house in the following late fall or early winter.  As petitioner points out, while several witnesses testified to petitioner burning something and there being a terrible smell, only Warren Ivery testified that he saw what he believed to be a human leg bone in the fire, testimony which strongly tied the fire to Minnella's remains.  Ivery also testified that immediately after seeing the bone he asked the heavyset elderly lady who resided at the Hamburg house if she wanted to come out and see it but that she replied that she did not want to go out there at all.   The only resident of the Hamburg house who testified at trial was Shunda Fenderson.  Earlene Fenderson was on the prosecution's witness list but trial counsel waived her production.  In his closing argument trial counsel attacked Ivery by pointing out that Shunda Fenderson  testified that she did not even see Ivery at the pertinent time.  The prosecution argued in rebuttal that Shunda Fenderson was tall and thin and therefore not the resident to whom Ivery reported what he had seen, "but he reported it to one of the Fenderson women."(7/11/02 Trial Transcript, pp. 130-131).

Petitioner has attached two documents which according to his appellate (and current)

counsel were found in trial counsel's file.  One is a Detroit police witness statement from Earlene Fenderson dated March 28, 2000.  It describes her as 50 years old, 5'3"tall, and weighing 285 pounds.  In the statement she provided the following: She  saw smoke in the backyard and it smelled like burning garbage.  She asked Ivery what was burning and what was that smell, and Ivery responded  that he did not know.  She did not see Ivery go into the backyard while she was there.  The second document is a report by the defense trial investigator, dated June 28, 2001, stating in part that he interviewed Earlene Fenderson and that she stated that Ivery had not said anything to her about seeing a bone.  Petitioner has also attached an affidavit from Earlene Fenderson, reiterating the above, and an affidavit from Elita Fenderson, stating that at the time in question she lived at the Hamburg house with her daughter Shunda and sister Earlene, that she noticed the fire when she came home from work, that Ivery said nothing to her about seeing a bone in the fire, and that no one else living at the house reported Ivery saying that he saw a bone.

        Had defense counsel called Earlene and/or Elita to testify, he might have successfully impeached Ivery's claim that he told one of the residents of the house that he saw a human bone. However, this impeachment would not have been very compelling.  The prosecutor would no doubt have suggested to the jury that it was just as likely that Earlene and Elita had not heard or understood what Ivery was telling them, or that they were lying because they did not want to get involved or because they did not want to admit that they heard about the bone and did nothing about it.  The prosecutor would no doubt have also attempted to use these witnesses to further corroborate the existence of the foul smelling fire.

        Further, while trial counsel might have rebutted  Ivery's claim that he *reported* seeing the bone to a resident of the home, none of the Fendersons would have contradicted the critical part of

25

his testimony, which was that he *saw* a leg bone with two knobs on the end in the fire. While this impeachment might have cast doubt on his general credibility, there was no apparent motive for Ivery to lie about what he saw, and his testimony was corroborated by the fact that a femur with two knobs was among the fragments retrieved. Trial counsel did attempt to impeach the critical part of Ivery's testimony by eliciting from another witness that the femur fragment that was found was approximately six inches long while Ivery described the bone as sixteen to eighteen inches long, and counsel argued this discrepancy to the jury.

3. Evidence Contradicting the Prosecution's Theory of the Events Between the Two Police Searches at Hamburg.

According to the proofs at trial, the March 3, 1999 search of the Hamburg premises turned up virtually nothing of significance other than the observation of two metal trash cans and the burn pit in the back yard. By contrast, on March 17, 1999 the police found bone fragments and teeth identified as those of the deceased, including some fragments that were readily observable on the surface of the yard and two on the garage floor.

In light of the fact that the two metal trash cans were missing on March 17th and that there was evidence that petitioner had either burned something in the cans or had put the debris from the fire into the cans, the prosecution's theory was that the remains that were found in the yard had been dumped there from the cans when they were removed.

It was established that petitioner was in prison between these two searches. His son, Sonny Sock, testified for the prosecution that he twice visited petitioner at the Macomb Correctional Facility sometime after February, 1999 and that on both occasions petitioner asked him to go to Hamburg and remove the metal cans. Sonny further testified that he did so after the second visit,

26

dumping what appeared to be ice and snow from the cans onto the yard before removing the cans from the premises and disposing of them. The prosecutor argued that this must have occurred between the two searches and that it explained why there were readily apparent remains visible at the time of the second search.

Petitioner faults trial counsel for not investigating and presenting several pieces of evidence concerning these searches and the intervening events:

1.) Petitioner has attached a police report, also alleged to have been in trial counsel's file, dated March 10, 1999, where Detective Hall wrote that the garage on Hamburg was "cleaned out and empty." Petitioner argues that this would have shown that there were no bones or white powder in the garage on this date, contradicting the prosecutor's suggestion that the remains were hidden in the garage and covered with lime, and would have raised doubts as to how the bones and powder came to be in the garage.

In fact, the report is of an interview with Thomas Nowicki, the neighbor, about the fire he saw at the rear of the Hamburg residence and petitioner's explanation that he was burning a dead possum. Nowicki also told Hall during this interview that he had seen some type of GM car, possibly blue, in the Hamburg garage. Hall concluded this report with the observation that Minnella's medium blue Chevy Beretta had not been recovered, and that the garage was cleaned out and empty.

Again, this evidence is of minimal value. It is not clear from the report that Hall actually went into the garage this day, and if he did, the implication is that he was looking for a car, not for tiny bone fragments or white powder.

2.) Petitioner has also attached a three page Detroit police trace evidence report, also alleged

27

to have been found in trial counsel's file, which petitioner claims contains important information about two pieces of evidence seized at Hamburg on March 17th. First, it indicates that approximately 100 hairs found in the garage were animal in origin. According to petitioner, this would support petitioner's claim that he was burning dead muskrats . Second, the report states that the submitted burnt blue material was melted plastic mixed with leaves. Petitioner asserts that this would show that petitioner was burning leaves and would contradict Detective Melise's testimony that the burnt material might be blue jean material.

This evidence was of little importance. As to the animal hairs, Nowicki confirmed that there had been a muskrat or possum problem in the area. On the other hand, there is no question but that the burned remains that were subsequently found were human.

As to the burnt plastic, the evidence technician, Kimberly Gabriel, did testify to finding melted plastic covering the rocks and bricks in the area where the ground was burnt. While the report provides that there were leaves mixed in with the melted plastic, this in no way makes it any less likely that parts of a body were also burned on the premises. While Detective Melise did testify that on March 3, 1999 he observed a cinder block in the pit with some burnt material on it that Melise thought appeared to be blue jean material, he also testified that he was not sure what it was. Furthermore there is no indication that Melise observed the same material as the samples submitted by the evidence technician, and moreover his testimony about the blue jean material played no role in the prosecution's arguments or theory.

3.) Petitioner has also submitted a Michigan Department of Corrections (MDOC) transfer order and his prisoner visit record from 2/17/99 to 11/06/00, showing that petitioner was transferred to Macomb Correctional Facility from the Reception and Guidance Center on April 8, 1999, that his

first visit was on April 27, 1999 and that the visitors that day included Louis Sock IV (Sonny).

It is clear that these documents contradict Sonny Sock's testimony that he removed the barrels from Hamburg in response to requests made by his father during their visits at Macomb Correctional Facility, since police testimony established that the barrels were removed between the March 3 and the March 17, 1999 searches.   It is also clear that these records were readily available to both the defense and the prosecution.  It is troubling  both that the  prosecution proceeded on this theory and that the defense did not correct it, particularly in light of the fact that Sonny Sock provided the same erroneous version of events as early as the January, 2001 preliminary examination.

However, even if trial counsel had impeached Sonny Sock with these records, they would only impeach his testimony as to where and how he received the instructions from his father.  His testimony that he did in fact remove the barrels is corroborated by the police testimony that the barrels were gone when they returned on March 17, 1999.  Furthermore, while it was the prosecution's theory that most of the remains were in the barrels and Sonny Sock dumped them onto the ground between the two searches, this was not an essential part of the proof of petitioner's guilt. In fact, Lieutenant Petersen, who directed the March 19, 1999 search, testified that his conclusion from the position of the bones under the snow and from the lack of any indication that they had been placed in the snow was that they had been there for most of the winter and had perhaps been there from the fall.  There are also other readily apparent possible explanations why the police did not observe the remains on March 3rd, e.g., that this search was just a cursory inspection, that there was more snow on the ground or that there was sloppy police work on that date. The essential fact remains that fragments of the victim's bones and teeth were found on the premises owned by

29

petitioner.  The prison records do not in any way make it more likely that petitioner would not have been found guilty.

Nor does a consideration of the cumulative effect of all of the above proffered evidence lead to a different result.  While petitioner correctly argues that the case was largely circumstantial, the evidence of guilt was nonetheless very strong.  Several witnesses established a long history of physical abuse, telephone records established a call from Minnella's house to petitioner's house after she left work on the day she disappeared, two witnesses established that Minnella then came to petitioner's house and that they had a violent encounter in petitioner's upstairs bedroom, family members and her employer/boyfriend testified that they never saw her again after that day, petitioner's son saw what he thought was a large stain bloodstain on the carpet outside of the petitioner's bedroom sometime after that, two witnesses established that petitioner subsequently removed and then replaced all of the upstairs carpeting even though it was brand new, several witnesses described petitioner burning something in the backyard of the rental property on Hamburg that smelled horribly, and Ivery testified that he saw what looked like a leg bone in the fire.  The evidence also established that two bone fragments were found in the garage at Hamburg and that petitioner had kept it locked and inaccessible to the tenants, other remains and teeth were found in the backyard at Hamburg, the remains were identified as Minnella's, and a DNA profile consistent with the deceased's was found in a bloodstain on the floor underneath the carpet in petitioner's upstairs bedroom.

Even assuming that trial counsel should have prepared or investigated more thoroughly or presented additional impeachment or rebuttal evidence, petitioner has not established that there is a reasonable probability that the outcome of the trial would have been different.  Having failed to

30

sustain his burden under the prejudice prong of *Strickland*, no further inquiry is needed. *Strickland*, 466 U.S. at 694 (directing that courts need not address both components of the inquiry "if the defendant makes an insufficient showing on one." *See also, Howard v. Bouchard,* 405 F.3d 459, 485 (6th Cir. 2005).

### 3. Denial of a Continuance

#### A. Applicable Law

The decision whether to grant a motion for continuance is within the discretion of the trial judge. See *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964).   When a denial of a continuance forms the basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process. *Bennett v. Scroggy*, 793 F.2d 772, 774 (6th Cir.1986).  A petitioner must also show that the denial of his request resulted in actual prejudice to his defense. See *United States v. Moreno*, 933 F.2d 362, 372 (6th Cir.1991).

#### B. Analysis

The court should find that  the Court of Appeals decision denying relief on this part of the claim was  not contrary to nor an unreasonable application of the applicable Supreme Court precedent.

While trial counsel gave several reasons to the trial court why an adjournment was necessary, in his petition for habeas relief petitioner describes the delay in receiving the discovery materials from the Clinton Township police as being the primary reason and that is the focus of his current argument.  To demonstrate prejudice, petitioner argues that the Clinton Township police reports lists seven potentially exculpatory witnesses and impeachment evidence, the same evidence

31

discussed above.

As indicated, trial counsel received these materials on May 31, 2001, and trial was scheduled to begin on June 26, 2001.  Unquestionably this was a long and complex case and there were delays in receiving the discovery.  Petitioner argues that it would take substantial time and effort to locate, investigate and evaluate the witnesses listed in the Clinton Township materials.  Respondent's argument that defense counsel just wanted to delay because he did not want to go to trial due to the strength of the evidence against petitioner seems implausible, considering that petitioner was incarcerated and no other advantage from a delay is apparent.

Nonetheless, petitioner has not shown either that the denial of the continuance was so fundamentally unfair that he was denied due process or that he was prejudiced by the denial of the continuance.  Trial counsel had six months from the preliminary examination to prepare for trial. Nine of the witnesses at trial, Dr. Saul, Julie Saul, Sonny Sock, Martha Staley, Jennifer Minnella, Dr. Chung, Warren Ivery, Michael Stuhldreer, and Phillip Minnella testified at the preliminary examination and were extensively cross-examined by trial counsel.  While the discovery materials may have been late in coming, petitioner makes no claim that he was prejudiced by delays in receiving either the Detroit police department or the FBI materials.  Counsel's performance at trial shows that he was very familiar with the evidence and with the results of the police investigations. While trial counsel legitimately might have wanted more time to investigate the Clinton Township discovery materials before trial,  petitioner has since investigated them and still does not demonstrate that the defense was actually prejudiced by their late receipt.  As previously discussed, the  witnesses at issue could have only testified that they saw someone after March 19, 1998 who looked like or fit the description of Minnella.  With regard to Detective Hall's report, Hall was listed

32

as a prosecution witness, he could have been easily contacted and interviewed and, also as discussed, the report disclosed nothing of significance. The defense was that the prosecution's largely circumstantial case failed to prove petitioner guilty beyond a reasonable doubt. The denial of the continuance did not result in actual prejudice to that defense.

E.    *Brady Violation and Improper Opinion of Guilt Testimony (Claim II).*

Petitioner claims that his right to a fair trial was violated because the prosecutor failed to disclose evidence in police possession and introduced the chief investigator's conclusion as to petitioner's guilt. As to the undisclosed materials, petitioner specifically takes issue with the prosecution's alleged failure to turn over original police notes of witness interviews and the file of a private investigator, Mark Messens[7], hired by the family of the deceased.

### 1. *Background*

As indicated, trial counsel obtained orders for discovery early in the proceedings. He subsequently filed a motion for discovery, argued on May 4, 2001. His requests included the notes or file of the private investigator hired by the deceased's family. He explained that Messens had worked with the police throughout the investigation, that the deceased's sister had testified at the preliminary examination that the investigator discovered the remains, and that the investigator had been present and had videotaped the March 17, 1999 search at the Hamburg house. The prosecutor responded that Messens worked independently of the police agencies, that she had interviewed him and determined that the only information or evidence that he had that the police did not was a videotape of the search and that she would get a copy of that and turn it over to the defense. She also provided that she had no exculpatory evidence. The prosecutor agreed to turn over what she

---

[7] There are various spellings of this name throughout the proceedings.

had and the trial court to that extent granted the discovery motion.

On May 31, 2001, defense counsel argued several motions, including a motion for disclosure of exculpatory and impeaching information, during which he complained to the Court that he had not yet received anything from the prosecutor concerning Messens. The prosecutor informed the court that she had turned over absolutely everything that she had in her file.

On June 25, 2001, trial counsel again moved on the record for production of Messens' file. The prosecutor again responded that Messens had simply acted as a liason between the family of the deceased and the police agencies and that she interviewed him and did not believe he had any documents not duplicated by those of the police. She further stated that she did not ask Messens for his personal notes because he was a private investigator and she did not believe they were discoverable. She had turned over the investigator's videotape. In response to the trial court's question about his efforts to contact Messens, trial counsel explained that he did not think it was appropriate to contact Messens himself since the trial court had previously ordered the prosecutor to make the request.[8]   The judge found that the prosecutor had turned over the discoverable information in her possession and denied the motion.

On this same date, trial counsel also moved for production of the police notes and reports for all witnesses who were interviewed in the case and not just the final typed reports for select witnesses. The prosecutor responded that she had given counsel everything that she had, that the police did not write reports for witness interviews that led nowhere, and that there was no exculpatory evidence that she was aware of that had not been turned over. The trial court held that the prosecutor had fully complied with the discovery orders and denied the motion.

---

[8] This does not appear to be a fair reading of the record.

On June 28, 2001, during trial, trial counsel again requested that Messens' notes and reports be made available to the defense.   The prosecutor responded that she did not have any of Messens' materials and that she had not endorsed him as a witness.  The trial court denied the motion.  When trial counsel stated that he would try to get the materials himself, the court responded that this is what he should do.

At trial and in response to defense counsel's questions, Detroit Police Lieutenant Petersen, who had been the  officer in charge for some fifteen months, testified that he retained some of his original notes but that most had been destroyed upon transcription into typed reports.  He explained that he interviewed at least one hundred people, that many interviews were non-productive and that he would have taken notes in many but not all of them.   When questioned about his contacts with Messens, Petersen explained that he had not worked closely with him and that  Messens had been sort of a liaison with the family of the deceased.  The witness further stated that he received Messens's notes and reports, that he did not find them very useful and that he could not say whether they were turned over to the prosecutor.

The following day, the prosecutor elicited from Petersen over objection that he had followed a number of leads but that none of them led to any suspects other than petitioner.  The prosecutor also elicited that she had the witness review the handwritten notes in his  file the previous night and that the notes all either led to petitioner as the suspect or eliminated other potential suspects.

Trial counsel moved for a mistrial because of the failure of the prosecutor to turn over the Messens' file.  He explained that he had finally been able to talk to Messens and Messens advised counsel that he had turned his entire file over to Lt. Petersen.   The prosecutor again  responded that she had nothing from Messens in her file and that she did not intend to call him as a witness and that

35

Petersen believed he had returned Messens' file to him.  Again, the trial court found that the prosecutor had complied with the discovery orders and had been very cooperative.

On his appeal to the Michigan Court of Appeals, petitioner submitted two previously undisclosed documents in further support of his argument that the prosecutor had failed to disclose material information: 1) A report by Clinton Township Detective Bate indicating that Phillip Minnella, the deceased's father, told the detective that if he found out that petitioner was responsible for his daughter's death  he would take care of it and petitioner would not be alive to tell about it. 2.) A handwritten memo to Lt. Petersen from Lt. Norell (presumably from the MDOC) dated March 19, 1999 indicating that a specified person from the MDOC had agreed to try to lengthen petitioner's stay at Reception and Guidance to six weeks which was beyond the normal period.  (The memo also states that while petitioner had no access to papers or television he was allowed to make "PCs" (presumably phone calls)).

The Michigan Court of Appeals found no error:

> Defendant next alleges that the prosecutor committed error requiring reversal by failing to turn over to the defense certain required evidence and by eliciting opinion testimony from the case investigator regarding defendant's guilt.  A trial court's decisions regarding discovery requests are reviewed for an abuse of discretion. *People v. Fink*, 456 Mich. 449, 458; 574 NW2d 28 (1998).  However, this Court "generally review[s] de novo allegations of prosecutorial misconduct." *People v. Pfaffle*, 246 Mich.App 282, 288; 632 NW2d 162 (2001). The prosecution is required by due process to turn over any evidence that is favorable to the defendant or that raises a reasonable doubt about the defendant's guilt. *People v. Stanaway*, 446 Mich. 643, 666; 521 NW2d 557 (1994). However, "[c]riminal defendants do not have general rights to discovery." *Stanaway, supra* at 680. Discovery in criminal cases is left to the discretion of the trial court. *Id*. Moreover, discovery should not be granted when the record indicates that the request is simply a "fishing expedition." Id., quoting *People v. Maranian*, 359 Mich. 361, 368; 102 NW2d 568 (1960).

> The trial court here was faced with an accusation by defense counsel that the prosecutor had not turned over evidence and an assertion by the prosecutor that she had turned over everything she had to defense counsel.  Defendant has not shown

36

any more than speculation that these materials, if they existed, might have made a difference to the outcome of the trial or that there might have been any bad faith on the part of the police.

Regarding the opinion testimony of the case investigator, the question is whether, considering the situation in context, *People v. Noble*, 238 Mich.App 647, 660; 608 NW2d 123 (1999), defendant was denied a fair and impartial trial. *People v. McElhaney*, 215 Mich.App 269, 283; 545 NW2d 18 (1996). In context, defendant has not shown this. Therefore, defendant has not shown that the trial court abused its discretion, that there was either a discovery or a due process violation, that the prosecutor committed misconduct, or that defendant was denied a fair and impartial trial.

State Appeal, p.2, 2003 WL 22160710 *1-2.  In his habeas petition, petitioner has again moved for an evidentiary hearing, attaching the same exhibits in support as he did in the state courts. Respondent argues that the decision of the Michigan Court of Appeals was neither contrary to nor an unreasonable application of Supreme Court precedent.

### 2.   *The Brady Violation*

#### A. *Applicable Law*

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  However, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87(1963). *Brady* does not grant broad discovery powers to the defendant. *United States v. Bagley*, 473 U.S. 667, 675 (1985).  In *Bagley* the Supreme Court emphasized that "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.*

In order to show a violation of the *Brady* rule, the petitioner has the burden of establishing three components: "The evidence at issue must be favorable to the accused, either because it is

37

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). *See also, Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000). Prejudice is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 280 (quoting *Bagley* at 682). On habeas review, a federal court must ask whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quotation marks omitted).

Further, "[t]here is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available ... from another source, because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998) (internal quotation marks omitted). If the evidence was available to the defendant from other sources than the state and he was aware of the essential facts necessary for him to obtain that evidence the *Brady* rule does not apply. *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004); *see also United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990).

Allegations of *Brady* violations present mixed questions of law and fact which are reviewed de novo. *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000).

### B.  *Analysis*

The court should find that petitioner has failed to establish a *Brady* violation.

There is nothing to indicate that the original police notes of witness interviews were

exculpatory or suppressed by the state or that they contained any information that would have led to a different result at trial. Lt. Petersen testified under oath that he reviewed the notes and that they contained no information helpful to petitioner. The prosecutor informed the court that she did not have the original notes in her file and the trial court accepted her assertion as true. It is also questionable whether the notes were even discoverable under Michigan law.[9]

Nor has petitioner satisfied his burden with the exhibits he has submitted. As to the first one, the report by Detective Bate that Phillip Minnella made a threat to kill petitioner if he was responsible for his daughter's death, Petitioner alleges that if it had been turned over to the defense it would have served two material purposes: 1.) It would have shown and documented Phillip Minnella's bias and 2.) It could have been used as a basis for cross-examination and impeachment of Detective Bates.

As to Minnella's threat, there is no probability at all that this evidence would have led to a different result at trial. His testimony that petitioner severely abused and threatened to kill his daughter would have led any reasonable juror to believe that he was biased against petitioner, and with good reason. The documented threat would simply have been perceived as a perhaps irrational

---

[9] In Michigan, the limits of discovery in criminal cases are set forth in the reciprocal criminal discovery rule, Mich.Ct. R. 6.201. The subject of discovery must be set forth in the rule or the party seeking discovery must show good cause why the trial court should order the requested discovery, *see People v. Phillips*, 468 Mich. 583, 588-589, 663 N.W.2d 463 (2003). In *People v. Holtzman*, 234 Mich.App. 166, 168, 178-179, 593 N.W.2d 617 (1999), the Court held that the term "statement," as used in Mich.Ct.R. 6.201(A)(2), does not include notes of an interview with a witness unless the notes comply with the definition of "statement" found in Mich.Ct.R. 2.302(B)(3), specifically that "[u]nless the 'notes' were a 'substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded,' or unless the witness signed or adopted the notes as his statement, they are not subject to disclosure under MCR 6.201(A)(2)." Id. at 179, 593 N.W.2d 617. There is no indication here that the notes at issue fit within the above definition.

39

but nonetheless normal gut response to the murder of his daughter.  Furthermore, the only testimony by this witness that was of any significance was that petitioner had abused and threatened Minnella, and this was also established through the testimony of other witnesses.  As far as Detective Bate, he testified to statements petitioner made to him during an interview, statements  that were contradicted by other evidence at trial.  Nothing in the report has any bearing on Bate's credibility or bias.

The second allegedly undisclosed document that petitioner has provided is the memo from the MDOC to Lt. Petersen dated March 19, 1999.  Petitioner is probably correct in his claim that this document proves that the police  knew that petitioner was quarantined at Jackson prison and was not at Macomb Regional Facitility during the time between the two searches at the Hamburg location. This information would have impeached Sonny Sock's testimony that he emptied the barrels after visiting his father at the Macomb facility and to that extent would have contradicted the prosecution's theory concerning how the remains came to be  visible on the ground at the time of the second search.  Assuming that the knowledge of the police is imputed to the prosecutor, it would also raise questions as to the propriety of the presentation of this testimony and theory.  However as indicated there is no *Brady* violation if the evidence was available to petitioner from a source other than the state and if he was aware of the essential facts necessary for him to obtain that evidence. *Spirko v. Mitchell*, *supra.*  Petitioner knew where and when he was incarcerated, he could have obtained his own prison records confirming this, Sonny Sock gave the same version of events at the time of the preliminary examination if not earlier, and petitioner could easily have corrected or prevented the misrepresentation of the facts.  Further, as discussed in the previous claim, there is not a reasonable probability that the evidence that petitioner was not at the Macomb facility at the

40

time described by Sonny Sock would have led to a different result at trial.

As far as the file or notes of Mark Messens, the private investigator, again there is nothing on the record to indicate that these contained any exculpatory information. Lt. Petersen testified under oath that he reviewed Messens' file and that it was not useful. The prosecutor represented to the court that she had interviewed Messens and had determined that the only material that he had which did not duplicate that already in the police file was the videotape of the search and she provided that to the defense. She also represented to the court that she had no exculpatory evidence that was not turned over to the defense. The court found that these representations were true.

Moreover, Messens was not a police officer and the trial judge rejected petitioner's claims that he was acting as an agent of the police. Trial counsel could have and apparently did ultimately interview Messens. Trial counsel also listed Messens as a defense witness but did not call him to testify. Because petitioner was aware that Messens conducted an investigation and because whatever exculpatory information he might have found was available through Messens himself, there cannot be a *Brady* violation. "There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available ... from another source, because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998) (internal quotation marks omitted). *See also, United States v. Todd*, *supra.*[10]

### 3. The Opinion Testimony of Lt. Petersen

---

[10]   In *Todd*, the government refused to disclose reports prepared after FBI interviews with Todd's brother and the brother's girlfriend. 920 F.2d at 404. This court concluded that no *Brady* violation occurred because Todd was informed before trial that both interviewees had potentially exculpatory information and Todd had an opportunity to interview them. *Id.* at 405. The "essential facts" in *Todd*, then, were the identities of the two potential witnesses.

41

A.  *Applicable Law*

It is a long-standing rule in Michigan that a witness cannot express an opinion on the guilt or innocence of a defendant. *See, e.g., People v. Parks*, 57 Mich.App 738, 750, 226 NW2d 710 (1975). An equally long-standing rule is that a prosecutor may not argue for conviction based upon the prestige of his office or an opinion of the police that a defendant is guilty. *People v. Stacy*, 193 Mich.App 19, 37, 484 NW2d 675 (1992).   However, errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are generally not reviewable in a federal habeas corpus proceeding.  *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir.2001); *Walker v. Engle*, 703 F.2d 959, 962 (5th Cir. 1983).  The court  may only grant habeas relief on this issue if the trial court's evidentiary ruling was so egregious that it resulted in a denial of fundamental fairness. *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir.2004).  "State court evidentiary rulings do not rise to the level of due process violations unless they 'offend ... some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Patterson v. New York*, 432 U.S. 197, 202(1977)(citations omitted).   Likewise, in analyzing a claim of prosecutorial misconduct, the standard is whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process. " *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  *See also Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

B. *Analysis*

The court should find that the decision of the Michigan Court of Appeals was neither contrary to nor an unreasonable application of Supreme Court law.

While it is clear that the Lt. Petersen's testimony about eliminating all other suspects but petitioner was an improper opinion that petitioner was guilty, *see e.g., Cooper v. Sowders*, 837 F.2d

42

284, 286-287 (6th Cir. 1988), the error does not rise to the level of a due process violation. The properly admitted evidence against petitioner was strong, the improper questions and responses were brief and they were given no further emphasis.

F. *Restrictions on Cross-Examination (Claim III)*

Petitioner claims that his rights to confrontation and to a fair trial were violated by various restrictions put on his cross-examination.

### 1. *Background*

Petitioner specifically alleges that his constitutional rights were violated because he was precluded from asking or restricted in pursuing questions about 1) the deceased's drug and alcohol addiction, 2) Jennifer Minnella's supplying the deceased with prescription drugs, 3) the deceased arriving late for work or not at all on Mondays and Tuesdays, 4) the deceased carrying many of her belongings in her car, 5) the deceased taking off and spending weekends with different men, 6) the deceased being investigated along with Michael Stuhldreer for writing or passing bad checks, 7) the deceased having been previously married to someone in a motorcycle club. Generally the restrictions were the result of the trial court sustaining the prosecution's hearsay or lack of relevance objections.

On direct appeal, as in the current petition, petitioner claims that cross-examination in these areas was necessary to contradict Phillip Minnella's testimony that the deceased was getting her life together when she left petitioner and moved home, to impeach her sister Jennifer's testimony that she was uncertain about the deceased's drug abuse and perhaps her testimony that Minnella wanted to leave work on the day of her disappearance because she was not feeling well, or to show that Minnella was reckless and placed herself in dangerous situations.

The Michigan Court of Appeals found no abuse of discretion and no violation of petitioner's

43

constitutional rights.

>Finally, defendant alleges that his constitutional rights were denied him because the lower court prohibited certain cross-examination by defense counsel. Although "limitation on cross-examination preventing a defendant from placing before the jury facts from which bias, prejudice, or lack of credibility of a prosecution witness might be inferred constitutes denial of the constitutional right of confrontation," *People v. Cunningham*, 215 Mich.App 652, 657; 546 NW2d 715 (1996), "neither the Sixth Amendment Confrontation Clause, nor due process, confers on a defendant an unlimited right to admit all relevant evidence or cross-examine on any subject." *People v. Hackett*, 421 Mich. 338, 347; 365 NW2d 120 (1984). Limitations on cross-examination are reviewed for an abuse of discretion. *People v. Cash*, 419 Mich. 230, 247; 351 NW2d 822 (1984).

>Defendant has not explained how any of the precluded cross-examination would have allowed defendant to test the "bias, prejudice, or lack of credibility" of witnesses or evidence. *Cunningham, supra* at 657. Instead, defendant appears to have been attempting to introduce rebuttal evidence, not impeachment evidence. "Admission of rebuttal evidence is within the sound discretion of the trial judge and will not be disturbed absent a clear abuse of discretion." *People v. Figgures,* 451 Mich. 390, 398; 547 NW2d 673 (1996). Even taking into account defendant's constitutional rights, defendant has not shown anything suggesting that the lower court abused its discretion in limiting cross-examination.

State Appeal, pp. 203; 2003 WL 22160710*2.

Respondent argues that the limitations imposed were minimal and reasonable and that the Michigan Court of Appeals did not unreasonably apply clearly established Supreme Court law.

## 2. Applicable Law

The Sixth Amendment guarantees the criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-316 (1974). The Supreme Court has emphasized that cross-examination is more than a desirable rule of trial procedure; rather, it is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316; *see also Chambers*

44

*v. Mississippi*, 410 U.S. 284, 295 (1973); *Pointer v. Texas*, 380 U.S. 400, 404 (1965).

At the same time, a trial court has discretion to limit the scope of cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). This includes discretion to impose limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant. *See id.; King v. Trippett*, 192 F.3d 517, 524 (6th Cir.1999)(citing Van Arsdall at 679). In this way, the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)(emphasis in original).

The Supreme Court has distinguished between a general attack on the credibility of a witness and a more particular attack on credibility directed toward revealing possible biases, prejudices, or ulterior motives relating directly to the issues or personalities in the case. *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir.2000) (citing *Davis* at 316). "Under *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser." *Id.* at 740.

The Sixth Amendment also guarantees a criminal defendant the right to present a defense, including the right to present the testimony of witnesses establishing the defendant's version of the facts so that the jury "may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). But the Supreme Court has made it clear that the right to present a "complete" defense is not an unlimited right. A defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). Rather, he "must comply with established rules of procedure and

45

evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. at 302 (1973). "While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes* v. *South Carolina,* 547 U. S. ___, ___ (2006) (slip op., at 6).

Confrontation Clause violations are subject to harmless error review. *Bulls v. Jones*, 274 F.3d 329, 334 (6th Cir.2001). When the record is so evenly balanced that there is a grave doubt as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless. *O'Neal v. McAninch*, 513 U.S. 432, 436-437 (1995).

### 3. *Analysis*

Viewing the alleged errors as either a restriction on cross-examination or on the presentation of rebuttal evidence, the court should find that the opinion of the Michigan Court of Appeals was neither contrary to nor an unreasonable application of Supreme Court precedent..

Initially it must be observed that despite some limitations trial counsel did introduce evidence in several of the categories he claims were unduly restricted. Jennifer Minnella testified on cross-examination and redirect examination that she and her father stated in the missing persons report that the deceased was an alcoholic and a drug abuser. (7/2/01 Trial Transcript pp. 186, 200). Trial counsel elicited through Schofield that Minnella had an alcohol abuse problem and that she kept changes of clothing in her car. (7/3/01 Trial Transcript p. 56-57). Phyllis Watkins testified on cross-examination that Minnella would go off for weekends with different boyfriends. (7/3/01 Trial

46

Transcript p. 13). And the prosecutor conceded the deceased's drug and alcohol problems in closing statement. (7/11/01 Trial Transcript p. 67).

None of the areas of questioning that were restricted or prohibited went to the bias or motive or prejudice or even the general credibility of any of the prosecution's witnesses. Nor has petitioner made any convincing argument, either here or in the trial court, that the evidence he sought to elicit was relevant either to countering the prosecution's theory of guilt or to establishing a defense theory of innocence. Even if some of the areas of questioning were directed to countering Phillip Minnella's testimony that the deceased was getting her life together after she left petitioner, this part of his testimony really had no bearing on whether or not petitioner murdered her and was irrelevant in itself, and even if it were relevant, other testimony, including that Minnella continued seeing petitioner, called the accuracy of her father's conclusion into question. Petitioner has not made out a constitutional violation, and even assuming he has, it cannot be said that there is a grave doubt that the restrictions on cross-examination had a a substantial and injurious effect on the verdict.

G.    *Evidentiary Hearing*

Petitioner asserts that he is entitled to an evidentiary hearing on his ineffective assistance of counsel and *Brady* violation claims because he never received such a hearing in the state courts. In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) whether a hearing is permitted under 28 U.S.C. § 2254(e)(2).

An evidentiary hearing is permissible in this case under § 2254(e)(2). That section provides that, "[i]f the applicant has failed to develop the factual basis of the a claim in State court

47

proceedings, the court shall not hold an evidentiary hearing on a claim unless" one of two exceptions is met. 28 U.S.C. § 2254(e)(2). In *Michael Williams v. Taylor*, 529 U.S. 420 (2000),[11] the Court explained that Congress's use of the term "'failed to develop' implies some lack of diligence[.]" *Id.* at 430. Thus, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432.

Petitioner timely and properly moved the Michigan Court of Appeals for a remand to the trial court so that he could make an evidentiary record in support of these claims, but this was denied "for failure to persuade the Court of the need for a remand at this time." *People v. Sock*, No. 238455 (Mich. Ct. App., December 16, 2002). Petitioner unsuccessfully renewed his request for a remand for an evidentiary hearing in his application for leave to appeal to the Michigan Supreme Court. Thus petitioner did not fail to develop the factual basis of his claims through lack of diligence or other fault. *See Mayes v. Gibson*, 210 F.3d 1284, 1288 n.2 (10th Cir. 2000) (*Michael Williams* standard satisfied where petitioner "raised the need for an evidentiary hearing" on direct appeal and in collateral review proceedings); *Morales v. Coyle*, 98 F. Supp. 2d 849, 893 (N.D. Ohio 2000) (*Michael Williams* standard satisfied where petitioner "sought an evidentiary hearing in state court, which was denied[.]").

Nevertheless, the Court should conclude that an evidentiary hearing is not necessary to

---

[11]This case should not be confused with the *Williams v. Taylor* case discussed in part C, *supra*, in which the Court explained the standard of review under § 2254(d). Although both cases bear the same caption and were decided on the same date, the petitioners differed in the two cases. For clarity, I refer to the case discussing § 2254(e)(2) by the petitioner's full name–"Michael Williams"–rather than just by "Williams" as is the ordinary citation convention. *See Watkins v. Miller*, 92 F. Supp. 2d 824, 828 n.1 (S.D. Ind. 2000) (taking same approach).

resolve petitioner's claims.   In making the determination of whether an evidentiary hearing is necessary under Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*, *Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963).   If the claims are clearly without merit, it is not abuse of discretion to deny a request for an evidentiary hearing. *See White v. Mitchell*, 431 F.3d 517, 533 (6th Cir. 2005).

Here, an evidentiary hearing would not have the potential to advance petitioner's claims.   As discussed above, even if the factual allegations contained in the documents petitioner submitted were made part of the evidentiary record, his claims would fail.   As far as the documents petitioner alleges that he never received, petitioner has not shown how a hearing would advance his claimed *Brady* violation.   Accordingly, the Court should conclude that petitioner is not entitled to an evidentiary hearing under Rule 8, 28 U.S.C. foll. § 2254.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.   Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.   The court should also deny petitioner's motion for evidentiary hearing.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation,

but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.

§ 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of

any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health*

*& Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.

1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not

preserve all the objections a party might have to this Report and Recommendation.  *See Willis v.*

*Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation*

*of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2),

a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than five (5) pages in length unless by

motion and order such page limit is extended by the Court.  The response shall address specifically,

and in the same order raised, each issue contained within the objections.

s/Paul J. Komives<br>
PAUL J. KOMIVES<br>
UNITED STATES MAGISTRATE JUDGE

Dated: 7/7/06

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record by electronic
means or U.S. Mail on July 7, 2006.

s/Eddrey Butts
Case Manager